# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. BYRON BECTON

**Appeal from the Criminal Court of Shelby County**
**No. 10-04987     L.T. Lafferty, Judge**

---

**No. W2011-02565-CCA-R3-CD  - Filed March 11, 2013**

---

Byron Becton ("the Defendant") was convicted by a jury of six counts of aggravated rape. At the sentencing hearing, the trial court merged each alternative count, entering three judgments of conviction for aggravated rape by use of force or coercion while armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon. The trial court also imposed an effective sentence of sixty-five years. In this appeal, the Defendant contends that the evidence is not sufficient to support his convictions and that the State engaged in prosecutorial misconduct during closing argument. Upon our thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Harry E. Sayle III (on appeal) and Lawrence R. White (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Byron Becton.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was indicted on August 10, 2010, on six counts of aggravated rape which occurred on December 16, 2009. The Defendant was indicted on alternative theories

for three separate acts: three counts of aggravated rape through force or coercion with a weapon and three counts of aggravated rape involving bodily injury.[1]  The Defendant proceeded to a jury trial on the indicted offenses on August 29, 2011, and the following proof was adduced:

During the State's examination of the victim,[2] she testified that on the evening of December 16, 2009, she left her home in Memphis, Tennessee, between 7:00 and 7:30 p.m. to walk to a friend's house to buy "a blunt, a five dollar nickel bag."  When the victim left her home, her fiancé was cooking dinner for her and two of her children who resided in the home.  She told her fiancé that she would be back in ten minutes.  The victim stated that she had not been drinking nor using any illegal drugs that day.

As the victim walked down Kendrick Street on the way to her friend's house, the Defendant approached her from the opposite direction and asked her if she "get[s] high," "[m]eaning crack."  She told him "no," and the Defendant asked her, "[D]o you know where I could go and sit and get high?"  The victim pointed to an abandoned house, but the Defendant said it was "too unopen for him."  She told him, "Well, I don't know," and she continued walking toward her friend's house.

As the victim approached Henderson Street, she noticed the Defendant walking behind her again.  She asked him why he was following her, and he denied that he was.  The victim then proceeded down an alley on Henderson Street with no street lights.  In the alley, the Defendant "grabbed [her] from behind" and put "something sharp in [her] back."  The Defendant told her, "[B]***h, if you move or if you scream that [sic] I'll kill you where you stand."  The victim stated that she "froze up" and "couldn't say nothing" because she was "[t]oo scared to say anything."  She testified, "I just knew he meant what he was saying, so I did what he said."

---

[1] With respect to counts one through three, the Defendant's indictment reads: "did unlawfully, intentionally, and by use of force or coercion while armed with an article used to lead [the victim] to reasonably believe it to be a weapon."  Throughout this opinion, we will refer to counts one through three as "aggravated rape through force or coercion with a weapon."  With respect to counts four through six, the Defendant's indictment reads: "did unlawfully and intentionally sexually penetrate [the victim] . . . and cause bodily injury to [the victim]."  We will refer to counts four through six as "aggravated rape involving bodily injury."

[2] It is the policy of this Court not to identify by name the victims of sex crimes.

The Defendant then pushed the victim out of the alley to the intersection of Henderson and Kruger and toward an abandoned house.[3]  While the Defendant pushed her toward the abandoned house, he had an arm around her neck and pressed the sharp object against her back.  When they approached the back door of the abandoned house, the victim stopped and did not want to go into the house because "[she] was so scared that [she] wouldn't come out."  The Defendant told the victim, "[B]***h, go on up in there[, g]o on up in there," and he was "constantly pushing [her] up in there."  The victim stated that it took "[m]aybe three minutes at the most" to get to the abandoned house after the Defendant "grabbed" her.

The victim described what the Defendant was wearing that night: "[f]aded kind of stone washed jeans"; "greenish maybe gray jacket button down with a zipper"; and "leather boots."  She described that he had "scars on his forehead," "gray short hair," and she believed a "little beard" that "was real low but you could see like the greyness out of it."  The Defendant also "had like two, maybe four teeth missing at the top."

Trash and animal feces littered the interior of the abandoned house.  There were no lights on inside the house, doors were off the hinges, and windows were broken out of the house.  Because there were no lights, the victim stated that she could not see inside the house.

The Defendant took the victim to a room down the hallway inside the house which she described as "the first bedroom to the left."  The Defendant hit the victim and knocked her down to the floor.  The victim stated, "We got to tussling.  We got to fighting. . . .  He was hitting me with his fist in my face, choking me."  She described that the Defendant was on top of her during this altercation.  The victim then grabbed "dog spray"[4] that she had brought with her from her house and sprayed the Defendant in the face, but "[i]t didn't effect [sic] him at all, at all."  In response, he told the victim, "[B]***h, . . . I knew you had something.  I knew you had something.  I'm going to kill you.  I'm going to kill you, b***h.  That's going to cost you.  That's going to cost you."  The Defendant then took the "dog spray" and sprayed the victim in the face.  According to the victim, they "kept on struggling" and she "kept on fighting with him."

The victim testified that she was still on the floor and that the Defendant was on her back at this point, so she started "feeling for something [she] could grab in the floor."  She felt "this light fixture thing" which was "in the corner like . . . almost by the wall" and

---

[3] The victim did not testify whether this abandoned house was the same one that she pointed out to the Defendant during her initial encounter with him.  According to Officer James Schmedes, "[I]n that part of town there are a lot of abandon[ed] houses."  See supra p. 14.

[4] The victim described this item as "dog spray."  She stated that she thought it was mace when she purchased it.

grabbed it, but she said the Defendant must have "felt me grab it" because "his arms came over mines [sic] and grabbed it too to see what I – so he could see what I had." The two then struggled for control of the light fixture. The Defendant said to her, "You just want to keep fighting with me. You just want to keep fighting me. Uh-huh." The victim stated that the Defendant then "snatched it from me" and began "beating me in my head with it. Constantly just hitting me in my head." The victim covered her head with her hands to prevent the Defendant from hitting her in the head, but he continued to hit her anyway. The victim testified that she did not lose consciousness during this altercation, but she "saw stars, plenty of stars, plenty."

The Defendant either dropped the light fixture or threw it down and then began hitting the victim in the face with his fists and choking her again. She had continued her attempt to fight the Defendant off of her but stated, "I just didn't have no more strength in me to fight him."

According to the victim, the Defendant then "just grabbed me and slid, I think he slid across the side of the room but he had me with him." Next, the Defendant ordered her to remove her clothes, to which she complied. She stated, "I resisted and I resisted but . . . the more I resisted the more he got [sic] just keep coming at me. I didn't know what to do, so I just gave in." After the victim removed her coat, shirt, and bra, he told her to take off her boots and pants. She stated, "At that same time he still had me wrapped around the neck, his arm around my neck." The victim believed she "was moving too slow" because, according to her, the Defendant "grabbed [a] bottle and just started hitting me everywhere with it, on my stomach, my legs, my knees and just saying hurry up, take your clothes off. Get your clothes off. Get your clothes off." She stated, "I don't know if it was a coca cola bottle or a beer bottle, I guess he felt that on the side of him." When she finished removing her clothes, she stated that the Defendant took the bottle and "put it in my vagina and was just going back and forth with it, jugging me with it." When asked whether the bottle penetrated her, she answered, "Yes." The victim stated that the Defendant then "took it out and just kept hitting me across my knees and my legs with it."

The Defendant told the victim to remove his clothes. As the victim was removing the Defendant's clothes, he continued to tell her to "hurry up. You're not taking it off fast enough." When the victim removed the Defendant's boots, he took one of the boots and hit her across the leg with it. Once the victim removed the Defendant's pants, she stated that "he told me to do oral sex with him." The Defendant "pushed [her] head down on his penis" and inserted it into her mouth. The victim believed that this went on for "a couple of minutes, a few minutes." The Defendant then ordered the victim to open her legs. She stated, "[H]e proceeded to get on top of me and have sex with me," and he was "[i]nside of me penetrating me." During this, the victim described that the Defendant had his hands on her chest holding her down and his head pressed against her head, holding it down. She said that it seemed as

-4-

though it went on for hours and that she did not want to have sexual intercourse with the Defendant. When asked why she cooperated, she stated, "Scared. Do whatever it took for me to get out [of] the house. Make sure that I was going to walk out of the house alive."

In an attempt to convince the Defendant to let her leave the abandoned house alive, the victim began talking to the Defendant and told him that she "could be someone he could come see on a regular basis or his girlfriend." The Defendant responded, "[A]h, you don't mean that. Stop lying. You're going to tell . . . the police. You're going to call the police because you seen my face. That's one thing you just you seen my face. I can't let you come, you know, walk up out of here." The victim promised the Defendant that she would not tell anyone. The Defendant continued to tell the victim that she was lying, but she continued her effort to convince him otherwise. The victim then provided the Defendant with a fake name, "Nichole, Nikki." She told the Defendant again that he could come see her and that they could be "friends or boyfriend girlfriend, however [he] wanted . . . [to] go about it." She reassured the Defendant several times that she was not lying and that she would not tell anyone. The victim also told the Defendant that she had children and that he could "get to know [her] family and everything." Eventually, she promised to give the Defendant her phone number before she left.

The victim believed it took approximately forty-five minutes to convince the Defendant to let her leave the abandoned house. The victim quickly got dressed, leaving behind her bra and, she believed, her panties. The Defendant also got dressed. Before the victim and the Defendant walked out of the house, the Defendant told her that his name was "Glen." The victim acknowledged that she did not see "a weapon" and that she did not "know whether he still had a weapon" at that point. However, when asked whether she believed the Defendant had a weapon "[d]uring the entire time he was with you," the victim responded, "Yes. . . . Because he stuck me in my back with something. I had no idea what it was but it was something." Moreover, she testified that he threatened to kill her "[n]umerous, numerous of [sic] times. At least over five, six times" while they were in the house.

The Defendant and the victim exited the house and proceeded down the driveway at 11:30 p.m. or 12:00 a.m. The victim stated that she still could not see the Defendant because it was dark at the house. However, when she got to the end of the driveway she could see him again because there was a light on the corner. The two of them continued down Kruger towards the "Men Lighthouse" ("Lighthouse Ministries").[5] According to the victim, at Lighthouse Ministries the Defendant wrote down her name and phone number, both of which were fake, on a piece of paper. After this, the victim and the Defendant continued walking

---

[5] The "Men Lighthouse" was later referred to as "Lighthouse Ministries."

in the direction of the victim's house.  The two approached the bridge that the victim initially crossed over on her way from her house to her friend's house.  The Defendant proceeded left towards Mapco and the victim proceeded right towards the bridge to cross over it to go back to her house.  The victim denied that the Defendant gave her "any problems in going the other way[.]"  However, she stated that he mentioned to her that there were police officers across the street and "was like, you're going to tell, you're going to tell."  She added, "I played it off and I said no, you know, and just let him go on about his business."  She then proceeded to walk over the bridge towards her house "as fast [she] could."

The victim acknowledged that she did not flag down the police officers who were nearby when she and the Defendant parted ways that night.  She stated, "[M]y thing was I was just trying to get over the bridge and home. . . .  And then go get [my fiancé] and come back and hopefully they were still going to be there, the police that is and they were."  In this regard, she further added,

> I wasn't focused.  I was scared.  I wanted to run and just let my fiancé, fiancé know what was going on with me because I had been gone for so long.  And I just wanted to get home.  My mind wasn't just focused on the police even though they were there.  I just wanted to get home to him and let him know that I was okay and what was going on with me.

The victim then returned to her house.  When her fiancé learned what happened, he got dressed, armed himself with a knife, and left the house to look for the Defendant because he "wanted to kill him."  The victim and her fiancé walked over the bridge where the victim and the Defendant had parted ways earlier.  The victim spotted the Defendant at Mapco while she was with her fiancé.  The two of them approached police officers who were parked in their patrol cars across the street from Mapco.  The victim told the police officers what had happened to her and told them that the perpetrator was standing across the street at Mapco.  One of the police officers drove to Mapco and placed the Defendant in the back of his patrol car.  The victim then accompanied another police officer in his patrol car to Mapco where she identified the Defendant as the perpetrator.

The police officers called for paramedics to come to Mapco.  When the paramedics arrived, the victim stated that she was "[s]till scared.  Still thinking that he's going to come after me."  The paramedics took the victim to the hospital, and she did not leave the hospital until sometime around 9:00 to 10:00 a.m. on December 17, 2009.  The victim described her physical injuries as follows:

> I had injuries in my head.  I had knots in my head.  I had scratches around my neck.  Scratches on my hands from the bulb fixture.  And scratches

in my womb.  Just bruises black and red – black and blue bruises all up my legs and thighs, yeah.  Black eye, busted lip.

She denied that her fiancé caused any of the injuries that she received that night.

From the hospital, the victim went to the Mid-South Sexual Assault Resource Center ("MSARC") and was there for approximately three hours.  At MSARC, the victim said that "[t]hey took swabs, stuff from under [her] fingernails, looked at [her] scars and that's about it."  The victim also underwent "[a] whole lot of counseling" there.

When the victim left MSARC, she spoke with a detective and gave a statement describing the incident that occurred the previous night.  The victim did not recall to which detective she spoke.  She remembered, however, that she finished speaking with him at approximately 4:30 p.m.  When asked how she was feeling at that point, she stated that she was "[s]cared to go home.  Scared to go to sleep.  Scared to walk outside [her] door.  Just basically wanted to be up in the house, not coming out.  Too scared. "

Lastly, the victim testified that the following morning, December 18, 2009, when she woke up she "could barely get out the bed" because she was "in so much pain."  When she got out of bed, she stated, "I looked at myself in the mirror and didn't know that he did so much damage to my neck, to my face and I could just feel my head just hurting . . . where he hit me in the head with the light fixture.  Everything was just hurting."  She also stated that her injuries looked worse than they did the previous day.  In this regard, she testified that she was

[b]lack and blue.  Probably swollen a little bit more than what it was.  My hands were swollen a little bit more than what it was.  My eye was a little bit swollen more than what it was.  My lip was a little swollen than what it was.  Everything had swelled up on me the next day after I woke up.

She also stated that, as of trial, she still had "scratches and scars" on her hands from the injuries.

During cross-examination, the victim admitted that she did not tell the detective in her statement that she had left her house on the night of the incident to go buy marijuana or "weed" from a friend.  The victim then added that when the Defendant asked her whether she "get[s] high," she said, "[N]ot crack but I smoke weed.  That's what I said."  Defense counsel pointed out that in her statement to the detective she said the Defendant asked her whether she gets high and she told him "no" but that she did not mention anything about crack cocaine.  She agreed that she did not.  The victim also acknowledged that in her statement she did not mention the Defendant's scars on his forehead to which she had testified at trial.

However, she testified, "I noticed the scars. It's something that stuck with me. I might not said [sic] it on paper but it stuck with me."

The victim also agreed that, although she told her fiancé she would be home in ten minutes and did not return for three to four hours, he was just sitting down, watching television when she returned home, and he did not call the police nor "put in a missing person report." She said that she "wouldn't say he wasn't worried, he just he asked what took [her] so long."

Defense counsel asked the victim how many times she was hit on the night of the incident. She responded that the Defendant hit her in the face more than ten times and in the head "maybe three or four times" with his fists throughout the night, more than nine times with the light fixture, and "probably five, six times" with the bottle. She also stated that she was hitting the Defendant with her "closed fist" anywhere she could when she was trying to fight him off and that she was "scuffling" with him. The victim also acknowledged that she "never saw a weapon" on the night of the incident and that she never was cut.

The victim stated that, after the Defendant finished hitting her with the light fixture, he had his arm around her throat and had her "pinned down," so she began "rumbling on the floor trying to feel something, . . . whatever [she could] get [her] hands on." Although in her initial testimony she said that the Defendant grabbed the bottle while she was removing her clothing and started hitting her with it, on cross-examination she agreed that her "hand came across a bottle" and that "[the Defendant] took it away from [her.]" Additionally, in her statement to the detective she said that the Defendant "grabbed the bottle out of my hand and he started hitting me. Hitting my stomach, my . . . leg, my cap, my knee cap."

The victim described that outside Lighthouse Ministries there was a small building ("security booth") at the entrance with an older man inside, which defense counsel characterized as a "security guard."[6] She acknowledged that she did not tell the security guard that the Defendant had just beaten and raped her. Initially, she denied that she approached the security guard to ask for paper so she could give the Defendant her fake name and number. She also initially denied that in her statement to the detective she said that she was the person who approached the security guard and asked for the paper on which to write her fake name and number. Instead, she maintained that the Defendant approached the security guard and asked for the paper. Defense counsel asked the victim to read the following portion of her prior statement aloud, to which she complied: "I stepped up to the

_____

[6] The victim did not believe he was a security guard because he was not wearing a uniform, he had no visible badge, and no weapon. However, for simplicity purposes, we will refer to this individual as a security guard because whether he was, in fact, actually a security guard is not material to the resolution of this case.

booth and there was a man in the booth.  I asked him for a pen and a piece of paper and that's when I wrote a fake number down."  After reading this aloud, the victim stated, "It's possible that I did that."  Defense counsel then asked, "And you're the one that asked for the paper so you could write the fake number trying to, trying to calm [the Defendant] down."  She responded, "Uh-huh.  Right."

Later, the victim added that she was not standing in front of the security booth where there was a glass window.  Instead, she stated that she was standing on the side of the security booth where there was a wood wall when she "asked him for the pen and paper."  She also stated, "[The Defendant] grabbed the pencil and the paper. . . .  [T]he guard did not hand me the pencil and paper."  She then "wrote [her] number down [using] the side of the booth."  The victim acknowledged that she did not tell the detective in her statement that she was standing to the side of the security booth out of the security guard's sight when she asked him for a pen and paper or that the Defendant grabbed it from the security guard.

The victim also agreed that the security booth was "pretty lit" and that the "security guard didn't ask [her] what's wrong with [her]."  She stated, however, that "[h]e wasn't paying any attention to me," and she mentioned again that she was not standing in front of the security booth.  Later, when asked by defense counsel a second time about the security guard's failure to inquire into her condition, "a bloody beat up woman with all this damage," she responded, "I wasn't too bloody.  I wouldn't say bloody like running blood.  You know my hands weren't even just running down with blood but it was, you know, like sores and scratches and source [sic] and you know like a little blood, line blood, a blood line, that's it."  Although she agreed that in her testimony to the State she said that she had a "busted nose," in her testimony to defense counsel she added that it was not "just pouring down with blood."

The victim also testified during cross-examination that she noticed two police officers and two patrol cars "[p]robably a couple feet, two" away from her when she and the Defendant parted ways near the bridge.  She stated that they "had just walked off from each other" when she saw the police.  She was walking back home, "up the bridge direction," and the Defendant was walking in the opposite direction, towards Mapco.  She did not go to the police at that point, however,  because she was "more scared than anything just to get home and get back over the bridge with [her] fiancé."

Defense counsel asked the victim whether she told the detective, in her statement, that she and the Defendant were still together when she saw the police and that she said, "[O]h, F the police."  She denied making these statements.  Accordingly, defense counsel then presented the victim with her prior statement and requested that she read the following portion aloud, to which she complied: "As we were talking there was, there were two cop cars over the bridge. As we were talking there were two cop cars talking across the street. He said there go the police and I faked him off and said f**k the police."  The victim

admitted, "Yeah, I did say that." She then agreed that she was still with the Defendant when they saw the police, although she previously testified that they had parted ways. She also agreed that the police did not notice her injuries when she walked by them, even though they were only "a couple feet" away from her and the street lights were lit.

The victim denied defense counsel's assertion that she "asked [the Defendant] if he had some crack cocaine[.]" She also denied that she was "doing drugs with [the Defendant] that night" or that she "smoked crack with [him]." She further denied that she "had consensual sex [with him] in exchange for crack cocaine[.]" Additionally, she denied the assertion that she sprayed the Defendant with the "mace" because "the crack ran out and [she] got irate" and that a fight ensued after she sprayed him with it. Further, she denied that her fiancé did not get upset and worried that she was not back for dinner after ten minutes because he knew that she was out "getting high on crack[.]" Lastly, she denied that "the reason [she] charge[d] [the Defendant] with rape [was] because [she] got beat up after spraying him with mace[.]" In this regard, on redirect examination, the victim denied that she was a prostitute and that she was giving the Defendant "sexual favors in exchange for crack cocaine[.]" Instead, she stated, "I'm not a street walker. I'm an at home mom laid off from my job which I just got back hired on. Not a street walker. Not a drug addict as far as crack cocaine."

Tyler Henry, a police officer with the Memphis Police Department ("MPD"), testified that on the night of the incident he "received a call by some other officers that they were flagged down," so he "decided to assist the officers." When he arrived at the scene, the victim approached the window of his patrol car and told him that she had been raped. It was approximately midnight at that time. Officer Henry described her demeanor as "obviously upset, crying," and he noted that she was with her fiancé[7] at the time, who appeared angry. The victim's fiancé was standing with her, he was not hurting her, and Officer Henry did not see the fiancé strike her. Instead, the fiancé was "just comforting her as she was telling [Officer Henry] what was going on."

Officer Henry testified that the victim appeared injured. She had "an injury on her forehead and [he] believe[d] her hands." The victim told Officer Henry that "she was raped by a male black wearing a gray bubble coat and blue jeans. And he had no teeth, upper teeth or missing some upper teeth and it was in an abandon[ed] house on Kruger." The victim described the location of the abandoned house to Officer Henry, what it looked like, and what she left inside. Specifically, she told him that she "left a black bra" and "some mace"

---

[7] Officer Henry referred to the victim's fiancé as the victim's "current boyfriend." Throughout this opinion, we will refer to this individual as the victim's fiancé because the victim characterized him as her fiancé.

inside the house, and she also described items "that [the Defendant] used to hit her with and used to penetrate her" that would be located inside the house.

The victim told Officer Henry that the man who raped her was at Mapco. Officer Henry had his "partners go obtain the subject and [he] and [the victim] and her [fiancé] went over there and [she] positively identified the suspect." Before driving them to Mapco in his patrol car, Officer Henry "pat[ted] them down for [his] safety." He did not find anything on the victim, but her fiancé had a "long knife" on him. At Mapco, the victim identified the Defendant as the perpetrator, and Officer Henry denied that she expressed any hesitation in identifying the Defendant. Officer Henry also said that the Defendant fit the victim's description perfectly: no upper teeth, grey bubble coat, blue jeans. After the victim identified the Defendant, the officers "detained" him. Officer Henry then called for an ambulance because he saw visible injuries on the victim.

The victim described to Officer Henry additional details about what happened that night. Officer Henry stated that his "partners then went to the crime scene and located everything she had described in that house." Officer Henry did not go to the crime scene. Lastly, Officer Henry noted that the Defendant looked cleaner at trial than he did on the night of the incident.

On cross-examination, Officer Henry testified that the injury to the victim's forehead was the only injury to her face that he recalled seeing. Officer Henry stated that he was not able to tell whether she had a hand injury, "but it looked like there was blood on her hands." Defense counsel asked Officer Henry what he would expect to see on an individual who sustained up to ten hits to the face, and Officer Henry responded, "Swelling, bruising." Lastly, defense counsel asked whether it was unusual that the perpetrator of a crime "would hang around the scene and wait for police?" Officer Henry responded that "if they think that they're innocent, then they'd probably hang around. If they don't think there's anything of it, they'd probably hang around."

Sally DiScenza, a forensic examiner with the Mid-South Sexual Assault Resource Center ("MSARC"), testified as an expert witness.[8] DiScenza collected evidence from the Defendant on December 17, 2009. Before collecting the evidence, she obtained a "suspect kit" from the "Sex Crimes Criminal Justice Center" which contained small envelopes in which to place the swabs once she collected the evidence. In this case, she collected saliva

---

[8] The State never requested that DiScenza be declared an expert. However, on cross-examination, defense counsel stated, "Your Honor, I don't know if [the State] asked that Ms. DiScenza be declared an expert in forensic nursing, but I would request at this point in time that she be declared an expert." The trial court permitted her to testify as an expert, but it did not state specifically her field of expertise.

swabs[9] and a penile swab[10] from the Defendant after he consented to her collecting these swabs. Once she collected the swabs, she turned them over to Sergeant Gilliam.

On cross-examination, defense counsel asked DiScenza what type of injuries she would expect to see on an individual who was "laying on her back on the floor face up and a perpetrator was straddling her knees midsection and hitting her forcefully in the face." DiScenza stated that she certainly would look for bruising and that it might potentially cause fractures. In response to being asked how soon she would expect to see visible results in such a situation, she stated,

> Well it depends on a lot of different things. For instance, the pigment of the victim. You know, we find with the African American women, in fact, sometimes what we tell them is, you know, please, if you see the bruising come out later come back because sometimes it can take several days.
>
> And then again sometimes with a very dark African American wom[a]n it's very difficult sometimes to see the bruising.

When asked about "lighter skin, medium complexion" individuals, DiScenza stated that it could take "[t]wenty-four to forty-eight hours." She testified that "[u]sually the first discoloring you would see is redness." She also said that "typically with hair it's more difficult to see" injuries. Additionally, DiScenza testified that she previously has examined victims that have given her "a history of being hit and hit hard and [she] see[s] nothing." Although she agreed that it is possible that a victim who has been hit in the face could have cuts on their face, a broken nose, and cut lips from teeth, she said that she typically does not see black eyes on victims after being hit because it "takes a little bit of time for the blacken of the eye." She agreed, nevertheless, that if a victim were examined twelve hours after the beating described by defense counsel, that it is "possible that . . . these injuries could start showing up[.]"

On redirect examination, DiScenza testified that she did not collect the swabs from the Defendant until 8:25 a.m. on December 17, 2009. She also stated that the time period

---

[9] DiScenza described that saliva swabs are collected to "to get the suspect's DNA." The process to collect a saliva swab involves using sterile cotton swabs to perform a "buccal scraping of the inside of the mouth."

[10] DiScenza collects a penile swab from an alleged perpetrator in an attempt "to recover . . . DNA from the victim on the [perpetrator's] penis." She also described the process to collect a penile swab: she takes a sterile cotton swab, moistens it with sterile water, and "rub[s] it lightly over the penile area as a matter of collecting . . . DNA evidence that may be there."

that a victim's DNA will be recoverable from a perpetrator's penis "depend[s] on a lot of factors" such as whether "it g[o]t wiped off" and the time frame. She agreed that the DNA can be wiped off intentionally or inadvertently. She further agreed that taking clothes on and off and going to the bathroom could wipe off the DNA.

Douglas Harrifield, a firefighter paramedic with the Memphis Fire Department, testified that he was working on December 16-17, 2009, and received a call at 12:45 a.m. on December 17, 2009, to treat the victim at Mapco on Jackson Avenue. When Harrifield arrived, the victim was still in the backseat of Officer Henry's patrol car. The police officers opened the back door of the patrol car so that Harrifield could begin to treat the victim. He described the victim's demeanor as "very quiet. She had a look of a [sic] she's terrified in the back of the patrol car." Harrifield described the victim's injuries as follows:

> She had a head injury. She had swelling on the left side of her forehead, large hematoma.[11] Soft tissue injuries on both hands. She complained of neck pain. She also did say she was knocked unconscious at one point. She was conscious upon our contact with her. She had left shoulder pain in the other areas and pelvic pain.

He did not recall that there was any "active bleeding," however.

Because the victim told him that she was "knocked unconscious," Harrifield placed a "C collar on [her] neck." He also took her out of the backseat of the patrol car, laid her on a flat board, assisted in stabilizing her body with straps, and placed "blocks on her head" because he does not allow people to walk when they have a head injury or complain of neck pain. The victim was transported to "Med Trauma, level one trauma center."

Harrifield agreed that the injuries he observed on the victim would be consistent with her "having sustained a beating both by fists and by objects[.]" He stated, however, that he only observed the areas outside of her clothing for injuries.

James Schmedes, a police officer with the MPD, testified that he was called to respond to an incident at Mapco on Jackson Avenue. He arrived at Mapco at 12:37 a.m. on December 17, 2009. Officer Schmedes described the victim's demeanor as "shaken," "alternating between being angry and crying," and "terrified."

---

[11] Harrifield described that a "[h]ematoma is basically swelling, pooling of blood underneath the dermis which is the skin between the skin [sic] and the skull." On cross-examination, Harrifield testified that a hematoma is caused "from being struck, blunt force trauma basically."

Officer Schmedes described the victim's fiancé's demeanor as "angry" and "really, really upset." Her fiancé also was "very protective of her" and was "trying to calm her." The victim told Officer Schmedes that she and her fiancé were looking for the Defendant and that he was across the street at Mapco. She informed Officer Schmedes that she and her fiancé came to the police instead of approaching the Defendant themselves because the police were nearby. The victim then briefly told the officers what had happened, and she described the Defendant's appearance to them – he was wearing a gray jacket, boots, and was missing teeth.

Officer Schmedes saw the Defendant at the window at Mapco attempting to purchase something. Officer Schmedes and several other officers went across the street to Mapco, and Officer Schmedes noted that the victim's description of the Defendant was consistent with what he observed. Officer Schmedes stated,

> We . . . spoke to him for a moment. He turned around. He was surprised. We told him that we needed to speak to him about a couple of things. And he was, you know, what for, why, a lot of, a lot of questions. A lot of strange remarks. We placed him in the back seat of the squad car and told him he was being detained for a moment for investigation.

Officer Schmedes also performed a "cursory pat down" of the Defendant to ensure the Defendant "d[id]n't have a pistol or something on him" before he placed him in the backseat of the patrol car. No weapons were found on the Defendant. Officer Schmedes also looked in the patrol car before he placed the Defendant in it to ensure that there was no contraband or anything the Defendant could use as a weapon, and "it was clean." Once the Defendant was detained in the patrol car, the victim was driven over to Mapco to identify whether or not the Defendant was the perpetrator. Officer Schmedes observed her positively identify the Defendant as her perpetrator.

After the victim's positive identification, the Defendant was handcuffed and placed under arrest for rape. Officer Schmedes stated that the Defendant was advised that "we didn't want to talk to him about it or anything like that." According to Officer Schmedes, "When we determined that we had everything in play and that, you know, [the victim's] story was credible to us, we went and located the crime scene after that."

Prior to the Defendant being transported to the police station, Officer Schmedes went to the patrol car to check on the Defendant. He stated that periodically the officers will check on whomever they have detained in the backseat of their patrol car. When Officer Schmedes opened the door of the patrol car, he observed "some bits of paper on the floor," and he observed the Defendant "tearing something up behind him, behind his back a piece of paper." Officer Schmedes grabbed the piece of paper from the Defendant and pushed him to the

other side of the patrol car "so that he wouldn't be able to kick [him] or anything." Officer Schmedes then grabbed the rest of the pieces of paper off the floorboard of the patrol car. He took the pieces of paper to the back of the patrol car, on the trunk, and attempted to "figure out what it was he was trying to tear up." Officer Schmedes was able to deduce that the paper contained a phone number and a name. He then went to the other officers to determine whether the paper was important. According to Officer Schmedes, the victim then advised him that she gave the Defendant a false number and told him that he could call her "to get [the Defendant] to leave her alone" and "to relax a little bit, not kill her."

The pieces of paper, however, were not introduced as an exhibit at trial. Officer Schmedes testified that the pieces of paper were lost.

Officer Schmedes asked the victim for additional details regarding the location of the rape because "in that part of town there are a lot of abandon[ed] houses." The victim informed him on which street the house was located. She also told him that a bra, "dog spray," a light fixture with which she was struck, and a bottle with which the Defendant penetrated her, would be inside the house. Additionally, Officer Schmedes believed the victim said a "razor knife," the "folding type," that either she had or the Defendant had, would be in the house.

Officer Schmedes located the abandoned house and confirmed that it was the location that the rape took place because the items that the victim described were located in a room in the house. Officer Schmedes personally did not photograph any evidence at the scene. Instead, "crime scene," who arrived some time after Officer Schmedes's arrival, photographed the evidence at the scene. He agreed that he only "looked everything over with a flashlight." He testified that the officers had to use flashlights to see inside the house because the electricity was not on.

Next, Officer Schmedes described that the room where the items the victim described were found also had "[b]lood on the walls." No testing was performed on what he described as blood, and he agreed that he cannot definitively tell the jury whether it was blood. He also specifically described an area of the wall that "appeared to be red and more red than it is [in the picture] and wetter, more wet I would say." Officer Schmedes described that a shirt also was found in this room and that it "was dirty and had red stuff on it."

On cross-examination, Officer Schmedes testified that the pieces of paper he confiscated from the Defendant still were sitting on the trunk of the patrol car when he left Mapco to go to the crime scene. He agreed that there is no mention of these pieces of paper in any police report or supplement connected to this case. In this regard, Officer Schmedes said, "[W]e dropped the ball on it. I'll principally take the blame for it. It's mostly my fault." Officer Schmedes did not realize this mistake until the first day of trial when he was

-15-

reading his partner, Officer Tyler Henry's, report while waiting to testify. When he realized Officer Henry's report did not mention the paper that he (Officer Schmedes) confiscated from the Defendant, he asked the prosecutor on this case about it.

Officer Schmedes also testified that, according to a crime scene investigation report, "crime scene" arrived to the abandoned house at 2:21 a.m. while he was still there. He did not know how long he was at the abandoned house before "crime scene" arrived, however.

Tracy Jones, lieutenant with the MPD, testified that in December 2009 he was working in the sex crimes division. Lieutenant Jones stated that his role was to assist Sergeant Gilliam in this investigation. On the morning of December 17, 2009, Lieutenant Jones and Sergeant Gilliam requested the Defendant's consent to have DiScenza take swabs from him for evidence. The Defendant signed a DNA release form in Lieutenant Jones' presence.[12] Lieutenant Jones also was present when DiScenza took the swabs from the Defendant. He noted that the Defendant's "teeth were crook – crooked teeth or something." The State requested at trial that the Defendant "stand up and show the jury his teeth," to which he complied.

On cross-examination, Lieutenant Jones testified that the Defendant signed an advice of rights form and that he and Sergeant Gilliam took a statement from the Defendant. In terms of the length of the statement, Lieutenant Jones stated that "on average our statements are a page or two. . . . [W]ith this type of case it could of been a couple of pages or more."[13]

Michael Hill, a sergeant with the MPD, testified that on December 17, 2009, he was called to assist other officers at 3545 Kruger Road, the address of the abandoned house. He received the call between 1:00 to 2:00 a.m. and arrived sometime after 2:00 a.m.

Sergeant Hill collected and photographed the evidence at the scene. Sergeant Gilliam told Sergeant Hill what items to photograph and collect because Sergeant Gilliam was the sex crimes investigator assigned to this case. Sergeant Hill photographed and collected the

---

[12] Lieutenant Jones noted that the "witness line" on the release form never was signed and that it was "just an omission had to be on my part and as well as the lead investigator."

[13] Defense counsel sought to pass the statement to Lieutenant Jones. The State objected, and a bench conference was held. The State argued that defense counsel was attempting to pass the statement to the witness so that the jury could see the statement. The State further argued that permitting this "goes against back-dooring the rule. The rule says that I can introduce his statement but that he cannot – he's not entitled to letting the jury know that it exists." Although the court did not specifically sustain the State's objection to passing the statement to the witness, defense counsel stated, "I'll just, I'll ask the question," and the trial court agreed, stating, "Yeah, okay, just ask him the questions," instead of passing it to the witness.

following items which were found in a room inside the house: a beer bottle, a "Husky folding knife," a can of "[d]og repellant," a black bra, a light fixture, and a blue and white jersey. Sergeant Hill testified that the light fixture had what appeared to be blood on it and that it appeared "wet." Likewise, he stated that the jersey had a red stain or mark on it that appeared to be blood and that it appeared "wet." Sergeant Hill also testified about a photograph that he took inside this room which showed "[w]hat appear[ed] to be blood on the walls." He said that a portion of it appeared to be dry and a portion of it appeared to be wet. Sergeant Hill did not have any of the evidence he collected tested, and he did not know whether any of the items were tested because Sergeant Gilliam determined what evidence was sent to the Tennessee Bureau of Investigation ("TBI") for testing.

Sergeant Hill did not attempt to lift any latent fingerprints from the house or the items within the house. He also did not swab the red substance that he photographed on the wall because the decision would have been Sergeant Gilliam's.

On cross-examination, Sergeant Hill agreed that his duties essentially consisted of preserving and documenting the crime scene, which included collecting evidence, drawing sketches, and taking photographs. He also agreed that he had not been trained in serology and that he cannot say definitively whether or not it was blood on the items he previously identified with red stains or marks.

With regard to the bottle which was collected as evidence, Sergeant Hill agreed at trial that it had what appeared to be dried "[s]pecks of dirt all around – pretty much evenly all round it[.]" He also agreed at trial that he did not see any substance that resembled blood on it or any other stain or liquid on it. With regard to the knife he collected at the crime scene, Sergeant Hill acknowledged that the knife "isn't a regular knife." He agreed that it had a lock blade and that a "button" would have to be pressed in order to close it when it was open. He further agreed that the knife was closed when he found it, stating that it was "folded up on the floor."

Judy Pinson, a sexual assault nurse examiner at MSARC, testified as an expert witness in the area of forensic nursing. Pinson testified that on December 17, 2009, she performed a rape examination of the victim. Pinson then described the process of performing a rape examination. Before the examination begins, the victim must sign a consent form. After consent is given, Pinson first will ask the victim what happened and then will ask for a brief medical history. Pinson said that they also "draw blood for . . . STD's." She then performs a general exam to look for injuries such as bruising, swelling, or anything abnormal. Next, a pelvic exam is performed and evidence is collected. She does not always collect the victim's clothing, but she usually collects the "underwear if it's available." The entire exam can take up to two hours.

Pinson testified that the victim was required to sign a consent form before the rape examination could be performed. On the consent form, Pinson described that there are several questions which request permission to perform different examinations or tests. Pinson marks these questions either "yes" or "no" depending on whether she is requesting permission from the victim to perform that test. On the victim's consent form, Pinson typed "no" for the request to take a urine sample for drugs. Pinson typed "no" for that request because she "didn't see a reason to test [the victim] for drugs." She agreed that the "no" for a drug screen was typed by her and that it was not the victim refusing to submit to that test.[14] Pinson also stated that when she fills out the consent forms and marks "yes," she does not necessarily perform that test during the examination.

Pinson stated that the victim's examination began at approximately 10:30 a.m. on December 17, 2009. She noted that the victim told her how upset she was, that the victim was cooperative, and that the victim gave a detailed description of what happened to her. Pinson then examined the victim for injuries, and she noted that the victim had the following visible injuries:

> She had superficial lacerations under her left eye, her neck and her upper chest. And a red contusion or bruise of her nose. And she had red contusions of her left knee and a purple bruise of her left leg. And she had superficial lacerations on the top of both hands, one hand was bandaged.

Pinson also agreed that the injuries she observed were consistent with the victim's account of what happened. She further agreed, hypothetically, that the injuries were consistent with the victim "having been hit in and around the head area with a fist or a blunt object" because "she had injuries . . . on her face and her neck." Additionally, Pinson stated that "it may be more difficult to see a bruise or injury on a darker skin person."

The victim did not have "any oral injuries" which were evident during Pinson's examination. Although the victim did not have "any oral injuries," Pinson stated "that doesn't mean that she wasn't forced to have oral sex." She did not find any injuries during the pelvic examination either, but Pinson testified that she rarely sees injuries in a woman who has been the victim of forced penetration by way of sexual intercourse. According to Pinson, it is "less likely to see injury in a woman who is adolescent or a woman who is estrogenized, who's started periods. . . . [W]e probably see injuries less in them than in a girl who has not been estrogenized or has not started periods."

---

[14] The State specifically asked Pinson about this response on the consent form because defense counsel vigorously cross-examined the victim as to whether she refused to give consent to the drug screen. The victim told defense counsel that she did not refuse consent for a drug screen.

-18-

During the pelvic examination, Pinson collected swabs from "the vulva, the external genitalia," "[t]he vagina," and "the cervix." The swabs then were dried in "a swab dryer," placed in an envelope, labeled, and placed into the rape kit box. She also collected anal swabs, oral swabs, and saliva standard swabs from the victim. Additionally, Pinson collected "a piece of gauze that [the victim] used to clean herself after she urinated." She noted that the victim already had urinated at the hospital, but she did not get a swab from that. Lastly, Pinson collected fingernail scrapings. She did not take any photographs of the victim's injuries, however, because MSARC "didn't have a working camera at the time."

On cross-examination, Pinson agreed that, based on examining victims, she cannot determine whether sex is consensual or forced. She further agreed that, in these cases, she cannot confirm or negate sexual abuse or physical assault. Pinson acknowledged that her report did not contain any reference to the victim having a "busted lip." When asked whether the victim had any evidence that "her nose had been busted," Pinson stated, "Yes. . . . [S]he had a contusion on her nose." When asked whether she "notice[d] dried blood or anything[,]" Pinson responded that she "didn't chart that there was blood." In terms of the sizes of the bruises that the victim had, Pinson acknowledged that her report reflected that the bruise on the victim's left leg was one inch in diameter and that the small red contusion that the victim had on her nose "was probably small enough that it would be difficult to measure."

Pinson did not remember whether she asked the victim about her drug usage. However, she did ask the victim whether she had consumed alcohol, and the victim stated that it had been more than twenty-four hours since she had consumed any.

Pinson clarified that the pelvic examination consists of an external examination and an internal examination. She uses a speculum during the internal examination so that she can see the cervix and uterus. Pinson agreed that she found "no apparent injuries" "[i]nside of the [victim's] vagina" during the pelvic exam. Pinson refused to give an opinion "about what kind of injuries somebody has from a beating" because "people show different kinds of injuries from it." Pinson did not document any type of bruise or injury on the victim's forehead. She also stated that she cannot "date bruises" and that "we don't know when they're going to show up, what they're going to look like or how long they're going to last."

Donna Nelson,[15] a special agent forensic scientist with the TBI, testified as an expert witness in the area of blood and serology. Special Agent Nelson examined a sexual assault

---

[15] Donna Nelson's testimony was pre-recorded through a video deposition, and the video deposition was played at the trial. The video deposition was taken on August 22, 2011, with Judge James C. Beasley, Jr., presiding.

kit[16] that was collected from the victim and a saliva standard and penile swab that was collected from the Defendant. The vaginal swabs revealed the presence of semen but no spermatozoa. No DNA profile other than the victim's was obtained from the vaginal swabs. Special Agent Nelson testified that it is not uncommon to solely obtain a DNA profile of the victim when you are "working with a vaginal swab which contains a lot of DNA from the victim [because] semen is overpowered in those samples." The anal and oral swabs, as well as the vaginal wipe, all failed to reveal the presence of semen. The examination of the victim's panties revealed the presence of spermatozoa, and Special Agent Nelson obtained a partial DNA profile from it which was consistent with a mixture of genetic material from at least two individuals. One of the individuals was an unidentified male, and the Defendant was excluded as the donor of that genetic material.

The Defendant's penile swab revealed a "partial DNA profile" which contained a mixture of female DNA and male DNA. Special Agent Nelson described that "[a]nything less than thirteen loci and the gender marker is considered a partial." She stated that a "partial DNA profile" results from either "not hav[ing] enough DNA or the DNA could start to break down." The time period and the storage conditions can effect whether DNA breaks down. Additionally, whether "an individual has taken a bath or tried to wipe themself off" can also affect whether or not DNA will still be present. In this case, she found "[f]our out of thirteen [loci] and the gender marker gave [her] information for comparison." Special Agent Nelson testified that this "partial DNA profile is consistent with the mixture of genetic material" from the victim and the Defendant. She further testified that the probability of obtaining this mixed profile from unrelated individuals from the African American population is approximately one in 112 individuals, the Caucasian population is approximately one in 232 individuals, the Southeastern Hispanic population is approximately one in 201 individuals, and the Southwestern Hispanic population is approximately one in 141 individuals.

On cross-examination, Special Agent Nelson agreed that she "cannot say to the exclusion of all other people that [the DNA from the penile swab] is specifically [the victim's] DNA and [the Defendant's] DNA[.]" She stated that she "can just say it's consistent with the two." She also agreed that every individual's DNA is unique, with the exception of identical twins but that "[a] lot of people share the same [loci]."

The State rested after Special Agent Nelson's testimony. The Defendant moved for a judgment of acquittal, which the trial court denied. The Defendant waived his right to testify and presented no proof.

---

[16] The sexual assault kit consisted of vaginal, anal, and oral swabs; underwear; a vaginal wipe; and fingernail scrapings collected from the victim.

Following deliberations, the jury convicted the Defendant on the six indicted counts of aggravated rape. At the sentencing hearing held later, the presentence report was admitted as an exhibit without objection.[17] The Defendant testified at the sentencing hearing and denied raping the victim. The trial court sentenced the Defendant as a Range II, multiple offender to forty years on count one and to twenty-five years each on counts two through six, all Class A felonies.[18] The trial court ordered count one to run consecutively to count three, and counts two, four, five, and six to run concurrently to counts one and three, for an effective sentence of sixty-five years, to be served with the Tennessee Department of Correction. The trial court then merged each alternate count, counts four, five, and six, aggravated rape involving bodily injury, into counts one, two, and three, aggravated rape through force or coercion with a weapon, respectively.

The Defendant filed a motion for a new trial which was denied by the trial court. The Defendant timely appealed, raising the following two issues: the evidence is insufficient to support his convictions and the State engaged in prosecutorial misconduct during closing argument.

## Analysis

### Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the evidence supporting his convictions. Our Rules of Appellate Procedure provide that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant

---

[17] Although defense counsel stated that he had "no objection to marking it as an exhibit," he did state that the Defendant "disagrees with the official version of the facts" which were included in the report. Additionally, with regard to the Defendant's prior convictions listed in the report, defense counsel discussed that it was very lengthy with "eighty-three misdemeanors and ninety-two nol-proses." Thus, he stated, "[W]hether this is an accurate reflection of his record, I can't say." He noted, however, that the State "brought documentation for the felonies, which are the more serious matters. So, I mean, I really have no objection to the presentence report."

[18] See Tenn. Code Ann. § 39-13-502(b) (2006).

has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003).

### *Aggravated Rape*

The jury convicted the Defendant of six counts of aggravated rape. The Defendant was convicted of three counts of aggravated rape through force or coercion with a weapon and three counts of aggravated rape involving bodily injury. The trial court merged counts four through six, aggravated rape involving bodily injury, into counts one through three, aggravated rape through force or coercion with a weapon, because they were alternative theories of the same offenses. The Defendant contends that the evidence is insufficient because (1) "[t]here is no physical evidence to support aggravated rape"; (2) "[n]o weapon was found even though [the] Defendant was arrested shortly [there]after"; (3) "[t]he DNA evidence was inconclusive to exculpatory"; and (4) "[t]he victim's account of the incident was not credible."

Our criminal code provides that aggravated rape "is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by . . . [f]orce or coercion . . . and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon . . . [or] [t]he defendant causes bodily injury to the victim[.]" Tenn. Code Ann. § 39-13-502 (2006). Sexual

penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal opening of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7) (2006). Coercion "means a threat, however communicated, to[] . . . commit any offense[,]" and force "means compulsion by the use of physical power or violence." Id. § 39-11-106 (a)(3)(A), (a)(12) (2006). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Id. § 39-11-106(a)(2).

Although the trial court merged counts four through six, aggravated rape involving bodily injury, into counts one through three, aggravated rape through force or coercion with a weapon, we will address the sufficiency of the evidence with respect to each count. We conclude that the proof is sufficient to support the jury's verdicts on all counts. The Defendant contends that the evidence is insufficient, in one regard, because there "is no physical evidence to support aggravated rape." We disagree. Physical evidence, such as the items recovered from the abandoned house, was presented at the trial. Moreover, we note that physical evidence is not a prerequisite to a conviction. See, e.g., State v. Wilson, No. W2001-03007-CCA-R3-CD, 2003 WL 261939, at *6 (Tenn. Crim. App. Feb. 3, 2003), perm. app. denied (Tenn. May 27, 2003); State v. Kendrick, No.02-C-01-9604-CR00121, 1997 WL 686266, at *2 (Tenn. Crim. App. Nov. 5, 1997), perm. app. denied (Tenn. July 13, 1998).

With regard to unlawful sexual penetration, the victim's testimony established that there were three different incidents of sexual penetration. She stated that the Defendant penetrated her with a bottle, that he forced her to perform fellatio, and that he forced her to have sexual intercourse with him. To the extent the Defendant avers that the jury should have discredited the victim's testimony because she was "not credible" and her testimony was "inconsistent and illogical," we will not disturb the jury's implicit credibility findings. See Winters, 137 S.W.3d at 655; see also State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) ("Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact. . . ."). Moreover, the Defendant's assertion that "the DNA evidence was inconclusive to exculpatory" avails him no relief. In fact, the DNA recovered from the Defendant's penile swab was consistent with a mixture of genetic material from the victim and the Defendant. Although it could not be determined conclusively, to the exclusion of all of other people, that this DNA was the victim's DNA and the Defendant's DNA, the victim's testimony, as recounted above, established the required element of sexual penetration as to each count.

With regard to accomplishing the acts through the use of force or coercion, the victim testified that the Defendant pushed her toward the abandoned house while he had an arm around her neck and the sharp object pressed against her back. Moreover, she also testified

-23-

that the Defendant threatened her several times. For instance, when the Defendant initially "grabbed" her in the alley, he stated, "[B]***h, if you move or if you scream that [sic] I'll kill you where you stand." Later, she testified that after she sprayed the Defendant with her "dog spray" he said, "[B]***h, . . . I knew you had something. I knew you had something. I'm going to kill you. I'm going to kill you, b***h. That's going to cost you. That's going to cost you." She further stated that while they were in the abandoned house the Defendant threatened to kill her "[n]umerous, numerous of [sic] times. At least over five, six times." Again, to the extent the Defendant avers that the jury should have discredited the victim's testimony because she was "not credible," we will not disturb the jury's implicit credibility findings. See Winters, 137 S.W.3d at 655; see also Flake, 88 S.W.3d at 554. The proof established both force and coercion.

The proof also established that the Defendant was "armed with a weapon or . . . article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." See Tenn. Code Ann. § 39-13-502(a)(1). The victim testified that the Defendant grabbed her, pressed "something sharp" into her back, and threatened her, stating, "[B]***h, if you move or if you scream that [sic] I'll kill you where you stand." She said that the Defendant kept the sharp object pressed against her back as he pushed her toward the house where she was raped. Additionally, a "folding knife" was found at the crime scene, in the room that the victim testified she was raped. As previously stated, we will not disturb the jury's implicit credibility findings. See Winters, 137 S.W.3d at 655; see also Flake, 88 S.W.3d at 554. This proof is sufficient for the jury to conclude that the Defendant was "armed with a weapon or . . . article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon." See Tenn. Code Ann. § 39-13-502(a)(1). The Defendant also argues that no weapon was found. This contention, however, goes to the victim's credibility, which, as discussed above, we will not second guess. We also note that the statute only requires that a defendant accomplish the act while "armed with . . . any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon," see id., not that a defendant still be in possession of the weapon when he is apprehended or that the weapon be recovered.

For these reasons, we hold that the proof is sufficient to support each of the Defendant's convictions of aggravated rape through force or coercion with a weapon.

The evidence also showed that the victim suffered bodily injury.[19] She testified that the Defendant choked her; hit her with his fists; hit her with a light fixture in the head numerous times; hit her with a bottle on her stomach, legs, and knees; and hit her with a boot across her leg. The victim testified that, as a result of this incident, she "had injuries in [her] head," "knots in [her] head," "scratches around [her] neck," "[s]cratches on [her] hands from the bulb fixture," "scratches in [her] womb," and "bruises black and red – black and blue bruises all up [her] legs and thighs." She also stated that she had a "[b]lack eye, busted lip." Additionally, Officer Henry, the MPD police officer, Harrifield, the firefighter paramedic with the Memphis Fire Department, and Pinson, the sexual assault nurse examiner at MSARC, all testified to the injuries they observed on the victim. Officer Henry noted that the victim had "an injury on her forehead and [he] believe[d] her hands." Shortly after the incident, Harrifield observed that the victim had "swelling on her forehead" and that "she had tissue wounds on both hands and stuff like that." Harrifield also agreed that the injuries he observed on the victim would be consistent with her "having sustained a beating both by fists and by objects." Pinson, who examined the victim the following morning, noted that the victim had a superficial laceration under her left eye, her neck, and her upper chest; a red contusion of her left knee; a purple bruise of her left leg; and superficial lacerations on the tops of both hands. Pinson also stated that the injuries she observed were consistent with the victim's account of what happened and consistent with the victim "having been hit in and around the head area with a fist or a blunt object[.]"

The evidence further established "physical pain," a necessary element of bodily injury. See Tenn. Code Ann. § 39-11-106(a)(2). In this regard, the victim testified that when she woke up the following morning after she was released from the hospital she "could barely get out the bed" because she was "in so much pain." She further stated, "I could just feel my head just hurting . . . where he hit me in the head with the light fixture. Everything was just hurting." Again, we will not disturb the jury's implicit credibility findings. See Winters, 137 S.W.3d at 655; see also Flake, 88 S.W.3d at 554.

For these reasons, we hold that the proof is sufficient to support each of the Defendant's convictions of aggravated rape involving bodily injury.

Accordingly, this issue is without merit, and the Defendant's convictions for aggravated rape are affirmed.

---

[19] The Tennessee Supreme Court recently held in State v. Farmer, 380 S.W.3d. 96, 102 (Tenn. 2012), that under the facts and circumstances of that case, a gunshot wound through the leg was not "serious bodily injury." Here, however, the aggravated rape statue requires only bodily injury. Thus, we need not analyze this case in light of Farmer.

**Prosecutorial Misconduct**

The Defendant contends that he is entitled to a new trial on the basis of prosecutorial misconduct during closing argument. Initially, we note that lawyers have great leeway in arguing before a jury, and the trial court has broad discretion in controlling their arguments, "to be reversed only upon a showing of an abuse of that discretion." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001).

In this case, the prosecutor asserted the following during the State's rebuttal closing argument, which ultimately led to the statement the Defendant argues was improper:

> Now when [the victim] testified and she told you about her injuries, she told you a lot about her injuries but no one ever asked her, I never thought to ask her, [defense counsel] never asked her, no one asked her what was there right when you left and what was not there till two days later [referring to the victim's injuries]. . . . No one asked her that.

Defense counsel immediately objected, stating that the prosecutor is "trying to put facts not into evidence in front of the jury." In response to the objection, the trial court stated, "All I got to say is the jury heard the testimony from the witness, they have heard the statements of the attorneys and they will be the final arbiters of what was said from that witness stand."

The prosecutor then continued:

> No one asked her that. And the law tells you not to speculate, not to guess. *The law tells you you can't consider the fact that he decided not to testify, but that's his right. But the law tells you not to speculate and not to guess. And that means don't speculate and don't guess what he might of said had he got up there.*

(Emphasis added). Defense counsel objected. The trial court responded, "I don't know if that's quite correct, general." A bench conference ensued, during which the following exchange occurred between the prosecutor, defense counsel, and the trial court:

Defense:    Your Honor, this is reversible error. I'm asking for a mistrial. That is, that is –

(Simultaneous speech.)

Court:      (Indiscernible)

Defense: Well I want to put that on the record, what she's did is –

Court: Make it. Make it.

Defense: That is prosecutorial misconduct. You are not allowed to argue that and she knows it as long as she's been around here. She is, she is attacking his right not to testify. There is case law on this, your Honor. This is reversible error.

Court: I know about case law and the elements that go in to tie [sic] that, but it was an unfortunate statement. That's all I'm going to say.

Defense: Well and it was done intentionally.

Court: Yeah, but –

Defense: This is prosecutorial misconduct. I will be writing the board.

Court: Okay.

Defense: I would like a jury instruction. This is serious, your Honor. We're looking at a lot.

Court: Well I'll just tell the jurors to disregard her statement says [sic] is –

Defense: It's more than that. That's improper argument.

Prosecutor: Judge, [defense counsel] talked about the [D]efendant giving several pages and was asking them to speculate.[20] And I was –

Defense: No, I didn't ask them to speculate.

---

[20] It appears the prosecutor is referring to the following portion of defense counsel's closing argument: "Sergeant, Lieutenant, I'm sorry, Lieutenant Jones was the assistant case officer, he was assisting Sergeant Gilliam. Now you heard about a piece of paper, the advice of rights. And he said [the Defendant] gave them a statement several pages long." The prosecutor objected. The trial judge stated, "Say what? Did somebody say something?" Defense counsel responded that "[s]he objected to me arguing the facts in evidence." The trial court overruled the objection.

Prosecutor: And without – I was re –

Court: (Indiscernible) before you finish it.

Prosecutor: I was responding to his argument.

Defense: I did not say that.

Prosecutor: And I didn't get to finish what I was saying with it. I apologize for the inference.

Court: All right. You stated your reasons why you made it, for the record, and then there, if there's an adverse verdict, you know –

(Simultaneous speech.)

Defense: Well she can't go there anymore about his right not to testify.

Court: She's not going to go there, are you?

Prosecutor: No.

Court: Yes.

After the bench conference, the Court instructed the jury, "All right, ladies and gentlemen of the jury, you will disregard the last words of the district attorney." The prosecutor then continued in a different vein.

Here, the Defendant is asserting that the State committed prosecutorial misconduct when the prosecutor referenced the Defendant's decision not to testify. A prosecutor's comment on the defendant's failure to testify violates the Fifth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution, both of which guarantee the defendant the right to remain silent. See, e.g., Griffin v. California, 380 U.S. 609 (1965) ("[T]he Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids . . . comment by the prosecution on the accused's silence. . . ."); State v. Transou, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996) ("It is constitutionally impermissible for a prosecutor to comment upon an accused's silence during the course of a trial. Such a comment undercuts the accused's privilege against self-incrimination, which is guaranteed by the Fifth Amendment to the

-28-

United States Constitution and Article I, § 9 of the Tennessee Constitution."); Ledford v. State, 568 S.W.2d 113, 116-17 (Tenn. Crim. App. 1978). Tennessee statute also protects this right: "The failure of the party defendant to make a request to testify and to testify in the defendant's own behalf shall not create any presumption against the defendant." See Tenn. Code Ann. § 40-17-103 (2006). Thus, a prosecutor "is strictly prohibited from commenting on the defendant's decision not to testify" and to do so constitutes misconduct. State v. Reid, 91 S.W.3d 247, 297 (Tenn. 2002) (citing Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995), superseded by rule on other grounds as stated in State v. West, 19 S.W.3d 753, 755 (Tenn. 2000)); see also Griffin, 380 U.S. at 614-15 (holding, as noted above, that the Fifth Amendment forbids comment by the prosecution on the accused's silence); Thompson v. State, 958 S.W.2d 156, 168 (Tenn. Crim. App. 1997) (holding that "[t]he law clearly prohibits any prosecutorial comment upon the accused's election not to testify," and "[t]o do so constitutes misconduct"); State v. Thomas, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991) (stating that "the United States Supreme Court held that a prosecutor cannot comment in final argument upon the accused's failure to take the stand in his own defense" and that this "has been the long-standing rule in Tennessee").

In this case, the prosecutor directly referenced the Defendant's decision not to testify, stating, "The law tells you you can't consider the fact that he decided not to testify, but that's his right. But the law tells you not to speculate and not to guess. And that means don't speculate and don't guess what he might of said had he got up there." We hold that the prosecutor's challenged statements clearly constituted a comment on the Defendant's choice not to testify at trial and, thus, were highly improper.

In Chapman v. California, 386 U.S. 18, 24 (1967), the United States Supreme Court recognized the application of the harmless error doctrine to constitutional violations, including improper prosecutorial comments on the defendant's failure to testify. See also Momon v. State, 18 S.W.3d 152, 164, n.15 (Tenn. 1999) (citation omitted) (noting that the harmless error doctrine has been applied to a constitutional violation involving a prosecutor's comment on the defendant's failure to testify); Transou, 928 S.W.2d at 960 (citations omitted) (holding that a comment on the defendant's decision not to testify "may be harmless . . . if it can be established that this transgression was harmless beyond a reasonable doubt"). The test used to determine whether a "non-structural constitutional error," such as the prosecutor's comments on the Defendant's right to testify, is harmless is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). It is the State's burden to establish beyond a reasonable doubt that the error was harmless. See id. ("The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless."); see also State v. Harris, 989 S.W.2d 307, 314-15 (Tenn. 1999); Momon, 18 S.W.3d at 167.

Thus, we must determine whether the State has met its burden of establishing harmless error beyond a reasonable doubt. In determining whether the prosecutorial misconduct had a prejudicial effect upon the verdict, we consider the following factors:

(1) the conduct complained of in light of the facts and circumstances of the case;

(2) the curative measures undertaken;

(3) the intent of the prosecutor in making the improper remarks;

(4) the cumulative effect of the improper conduct and any other errors in the record;

(5) the relative strength or weakness of the case.

State v. Thornton, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999) (citing Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving Judge factors in determining whether misconduct resulted in reversible error). If we determine that these factors demonstrate beyond a reasonable doubt that the misconduct had no prejudicial effect on the verdict, the Defendant will not be entitled relief.

Initially, we note that the State, in its brief, identified and analyzed a prosecutorial statement which was not challenged by the Defendant in this appeal. Specifically, the State's brief states as follows:

The [D]efendant complains of the following statement:

Now when [the victim] testified and she told you about her injuries, she told you a lot about her injuries but no one ever asked her, I never thought to ask her, [defense counsel] never asked her, no one asked her what was there right when you left and what was not there till two days later.

The State's brief then analyzed this prosecutorial statement in determining that there was no prosecutorial misconduct in the prosecutor's closing argument. Nevertheless, based upon our review of the comments actually challenged, we conclude that the prosecutor's misconduct was harmless beyond a reasonable doubt for the reasons set forth below.

We first consider the prosecutor's misconduct "in light of the facts and circumstances of the case[.]" Thornton, 10 S.W.3d at 235. In analyzing this factor, "the courts have considered whether the remarks were lengthy or repeated, or whether the statement was single or isolated." See Judge, 539 S.W.2d at 344. "They have also taken into account whether the improper remark of the prosecutor was made in response to the defendant's comments or argument" and "the general 'atmosphere' of the courtroom." Id. (citation omitted). Here, the prosecutor's challenged remarks were only a small portion of her closing argument, which otherwise focused on the facts and circumstances of the crime. Although the prosecutor explained that she made this comment in response to a statement defense counsel made in his closing argument, her comment was not a proper response. Nevertheless, this factor weighs in favor of the State.

Next we consider the curative measures undertaken. Thornton, 10 S.W.3d at 235. Here, the prosecutor's improper comment elicited a prompt objection by defense counsel. The trial court immediately stated to the prosecutor, "I don't know if that's quite correct, general," and a bench conference ensued. The trial judge implicitly sustained the objection by stating that the prosecutor would not "go there" again and by instructing the jury to "disregard the last words of the district attorney." The prosecutor then proceeded in a different vein. Additionally, in the jury instructions given at the close of trial, the trial court issued the following instruction:

> The [D]efendant is not required to take the witness stand in his own behalf and his failure to do so cannot be considered for any purpose against him nor can any inference be drawn from such failure of the [D]efendant who did not take the stand in his own behalf.

The jury is presumed to have followed this instruction. See, e.g., State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001). Although an improper remark by the prosecutor made during argument may constitute reversible error despite curative instructions by the trial court, see Judge, 539 S.W.2d at 345, we conclude that the curative measures taken by the trial court, albeit minimal, marginally were sufficient for this factor to weigh in favor of the State.

We next examine the prosecutor's intent in making the improper comment, Thornton, 10 S.W.3d at 235, "although arguably the prejudicial effect to the defendant is the same regardless of the prosecutor's good or bad intent." See Judge, 539 S.W.2d at 346. Here, the prosecutor asserted that she made the improper comment in response to defense counsel's statement in his closing argument. She added, "And I didn't get to finish what I was saying with it. I apologize for the inference." Thus, it is clear she made her comment intentionally. Nevertheless, we hesitate to infer bad intent on the part of the prosecutor. While we reiterate that it is incumbent upon prosecutors to refrain from commenting, whatsoever, on a

defendant's decision not to testify, because we find no bad intent, this factor also weighs in favor of the State.

We next consider the cumulative effect of the misconduct and any other errors evident in the record. See Thornton, 10 S.W.3d at 235. The only other error about which the Defendant complains is the sufficiency of the evidence, which we have determined is without merit. Accordingly, this factor weighs in favor of the State.

Finally, we consider the relative strength or weakness of the case in determining the likelihood of prejudice in the minds of the jury. See Thornton, 10 S.W.3d at 235; see also Judge, 539 S.W.2d at 346. The prejudicial impact of an improper remark on the jury is likely to be greater in a case that is "close" than it would be in a case where evidence of defendant's guilt is overwhelming. See, e.g., Judge, 539 S.W.2d at 346. The proof in this case is strong. The victim testified in detail to three different incidents of rape. Her account of what transpired on the night of the incident also is supported by the evidence collected from the crime scene and the testimony of the State's witnesses concerning her demeanor, injuries, and account of what happened. Thus, this factor weighs in favor of the State.

Considering all of the Judge factors, we hold that the record establishes beyond a reasonable doubt that the prosecutor's improper comment did not have a prejudicial effect upon the jury's verdict.[21] Accordingly, the Defendant is not entitled to a new trial on this basis.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
JEFFREY S. BIVINS, JUDGE

---

[21] This conclusion in no way should be interpreted as this Court approving the prosecutor's comments. This legal conclusion does not change the fact that the comments were highly improper.